**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL GFESSER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 5151** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Nan R. Nolan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Gfesser claims that he is disabled due to arthritis and ankylosing spondylitis. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, this case is remanded for further proceedings consistent with this opinion.

**PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI on October 25, 2005, alleging that he became disabled on September 29, 2004 due to arthritis, rheumatoid arthritis and ankylosing spondylitis.[1] (R. 170-72.) The applications were denied initially on December 14, 2006, and again on reconsideration on June 21, 2007. (R. 79-88, 94-101.) Plaintiff appealed the decision and requested an administrative

---

[1]    "Ankylosing spondylitis" is "a chronic inflammatory disease that primarily causes pain and inflammation of the joints between the vertebrae of [the] spine and the joints between [the] spine and pelvis (sacroiliac joints). However, ankylosing spondylitis may also cause inflammation and pain in other parts of [the] body as well." (http://www.mayoclinic.com/health/ankylosing-spondylitis/DS00483.)

hearing. The hearing occurred on January 7, 2009, at which time Plaintiff amended his disability onset date to December 31, 2005. Shortly thereafter, on January 30, 2009, the Administrative Law Judge ("ALJ") found that Plaintiff is not disabled because he is capable of performing a range of unskilled, sedentary work on a sustained basis. (R. 16-24.) The Appeals Council denied Plaintiff's request for review on June 26, 2009, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-4.)

## FACTUAL BACKGROUND

Plaintiff was born on April 17, 1980, making him 28 years old and a "younger individual" at the time of the ALJ's decision. (R. 167.) He has a high school diploma and completed two years of college. (R. 49, 249.) Plaintiff has worked a variety of part-time jobs over the years, including as a consultant, a computer technician, a waiter and a sales representative. (R. 46-47, 83, 88, 182-93, 245.)

### A.    Medical History

#### 1.    2004 through 2006

The first medical record available is from April 9, 2004, when Plaintiff had an MRI of his thoracic spine due to complaints of back pain. The MRI showed mild multilevel compression from T3 through T8, with "more marked" findings at T4, T5 and T6. (R. 316.) There was also prominent signal abnormality at T7, likely caused by an acute Schmorl's node[2] with associated marrow edema. (R. 317.) The MRI revealed no cord compression or deformity, but Plaintiff had experienced a 30% loss of height. (R. 316-17.) An MRI of Plaintiff's lumbar spine dated April 13, 2004 showed mild to moderate disc dehydration at L3-4 and L4-5, with slight loss of disc space height at both levels. The MRI confirmed a Schmorl's node-type disc protrusion involving L4 and

_____

[2]    A "Schmorl's node" is "[a]n upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae (the bony building blocks of the spine)." (http://www.medterms.com/script/main/art.asp?articlekey=14007.)

L5, and revealed "adjacent marrow signal abnormality and enhancement suggesting that these are acute or subacute in nature." (R. 318-19.) In addition, there was a "central disc extrusion with slight caudal migration of disc material" below the L4-5 level, as well as "facet arthropathy and ligamentum flavum hypertrophy" at L5. The radiologist opined that this combination of findings "produces mild to moderate central spinal stenosis." (R. 319.)

After reviewing these MRI results, Dr. James Sperling, M.D., of Orthopedic Specialists, PLLC, concluded on April 15, 2004 that Plaintiff had sacroiliac ("SI") joint sclerosis. He diagnosed a positive HLAB 27[3] and elevated inflammatory markers, and expressed concern about more soft tissue problems. Dr. Sperling also documented his concern about Plaintiff's need for significant narcotics, noting that he took a lot of Vicodin without any response. The doctor referred Plaintiff to a rheumatologist for further assessment, but there is no evidence in the record as to whether Plaintiff pursued that recommendation. (R. 314.)

To the contrary, it appears that Plaintiff next sought treatment in April 2005 at the Dachman Center for Pain Therapy. (R. 331.) On April 14, 2005, Veena Nayak, M.D., S.C., diagnosed Plaintiff with "[a]nkylosing spondylitis with facet syndrome of the lumbar spine and tendonitis in supraspinatus tendon, and sacroilitis." She administered joint and tendon sheath injections to help with the pain. (R. 387.) Plaintiff saw Dr. Nayak again on April 21, 2005 for a follow-up visit. His blood work revealed a positive HLAB 27, and his bone density evaluation was significantly low. Dr. Nayak advised Plaintiff to begin physical therapy and myofascial release "as soon as possible." (R. 386.) She also noted "severe decreased range of motion in the cervical and thoracic spine with kyphosis [curving of the spine] and positive Faber [indicating pressure on the spinal cord], and some associated lumbar dysesthesia [sense distortion] with tendonitis." (R. 385.)

---

[3]     HLAB 27 is associated with autoimmune diseases, such as ankylosing spondylitis. (http://www.nlm.nih.gov/medlineplus/ency/article/003551.htm.)

The next progress notes date from September 7, 2005, when Carey B. Dachman, M.D., S.C., reported that Plaintiff was feeling "a lot better." Plaintiff was taking Enbrel, methotrexate, Valtrex and Fosamax at that time, and Dr. Dachman added a prescription for Forteo to help with Plaintiff's osteoporosis. (R. 329.) Dr. Dachman ordered an MRI and ultrasound of Plaintiff's extremities "in view of inflammatory arthropathy and desire to determine degree of bone marrow edema, erosion, and enthesopathy at hand." He also advised that Plaintiff have a biofeedback study for his sleep disturbance, and that he start physical therapy. (R. 330.)

On October 6, 2005, Plaintiff saw Nurse Practitioner Patricia Morgan, MSN, APRN, BC, at the Dachman Center. Nurse Morgan noted Plaintiff's history of ankylosing spondylitis, and confirmed that he was taking Enbrel. Plaintiff told Nurse Morgan that he decided on his own to stop taking methotrexate due to a concern regarding his liver enzymes, and he found Lunesta unhelpful for his sleep problems and stopped taking that as well. He did, however, take Ultracet on occasion for pain. (R. 326.) Plaintiff reported working out four times a week, but Nurse Morgan noted that his April 2005 DEXA scan revealed "very significant osteoporosis especially in [the] spine." Plaintiff stated that he had taken Fosamax to help with his bone density (he had lost over 3 inches in height), but stopped when he ran out. (Id.) Nurse Morgan switched Plaintiff from Ultracet to Norco for pain, and diagnosed "ankylosing spondylosis, stable" and osteoporosis. (R. 327.)

Plaintiff saw Dr. Dachman again on November 3, 2005. He noted loss of lateral rotation by 20% and weakness proximally; prescribed double Enbrel for four weeks; and referred Plaintiff for physical therapy and myofascial release. (R. 325.) The next day, Plaintiff had an ultrasound of his right hand and wrist. The hand showed tendonosis and degenerative first and fifth MCP joint with pannus formation. The wrist showed median nerve entrapment, tenosynovitis, degenerative radiolunate, lunate capitate and ulnocarpal joint. Michele Fleischmann, M.A., confirmed the therapy referral and instructed Plaintiff to continue with Dr. Dachman's treatment plan. (R. 323.)

4

On December 14, 2005, Nurse Morgan prepared a letter stating that Plaintiff suffers from ankylosing spondylitis, and that MRIs revealed significant multilevel compression deformities accounting for "a loss of three inches in height." When Plaintiff first presented to the clinic he was gaunt (weighing 145 pounds), depressed and in signifcant discomfort. The subcutaneous injections of Enbrel and methotrexate, however, helped Plaintiff return to his normal weight (185 pounds) and control his pain. Nurse Morgan stated that Plaintiff must continue taking these medications, along with narcotic pain medication and Fosamax to help slow the progression of bone loss. She cautioned that discontinuing this treatment regimen would result in Plaintiff "revert[ing] back to his previous state of ill health." (R. 331.)

The next medical record is a November 8, 2006 consultative psychological evaluation of Plaintiff performed by William N. Hilger, Ph.D., on behalf of the Bureau of Disability Determination Services ("DDS"). (R. 332-35.) Plaintiff said that he had performed retail work for 3 ½ years, but that he was continually late and frequently called in sick. When he lost his job and medical insurance in December 2005, he was not able to afford further medication or treatment. (R. 333.) Plaintiff told Dr. Hilger that he did a little vacuuming and cooking at that time, but that he needed to be very careful due to his low bone density and risk of fracture. He was able to dress himself, fold clothes, play on the computer, drive, and bathe, but he also needed more time for each activity and could not sit for long stretches because his body would stiffen. (*Id*.) Dr. Hilger concluded that Plaintiff is in pain "much of the time" and has "difficulty sitting for extended periods of time or doing anything." He agreed that Plaintiff needs proper medical treatment for his physical conditions, and found him to have "fair mental potential, depending especially on his physical condition, to perform any work related activities." (R. 334-35.)

Two days later on November 10, 2006, Mohammad Vaseemuddin, M.D., completed a Disability Evaluation Report of Plaintiff for DDS. (R. 337-41.) Dr. Vaseemuddin did not have any of Plaintiff's medical records, and noted that ankylosing spondylitis of the spine was "not

demonstrable on radiological assessment or examination done at our office today." (R. 337, 340.) Nevertheless, the doctor acknowledged that Plaintiff had been diagnosed with rheumatoid arthritis, ankylosing spondylitis and osteoporosis, and that he complained of early morning stiffness "which needs [to be] assessed further by a rheumatologist." (R. 340.) Dr. Vaseemuddin noted that Plaintiff's pain was much improved when taking Enbrel, and found him able to sit, stand, walk, handle objects and perform fine manipulations. (*Id*.) Plaintiff complained of chronic pain in his cervical, thoracic and lumbar spine, as well as fatigue, but Dr. Vaseemuddin found him able to move around "without limitation of activity due to pain." Dr. Vaseemuddin further noted that "this may be an important time that he needs to start followup in terms of getting his pain under control." (*Id*.)

On December 4, 2006, David Gilliland, Psy.D., completed a Psychiatric Review Technique Form ("PRTF") on Plaintiff. (R. 348-60.) He found Plaintiff to have a normal mental status, noting the absence of any psychological counseling or treatment. (R. 360.) Virgilio Pilapil, M.D., performed two Physical Residual Functional Capacity ("RFC") Assessments of Plaintiff on December 7, 2006. (R. 362-77.) In both, Dr. Pilapil found Plaintiff capable of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; sitting (with normal breaks) for 6 hours in an 8-hour workday; and pushing and pulling without limitation. (R. 363, 371.) He assessed no postural, manipulative or environmental limitations, and opined that "[b]ased on current exam and objective findings [Plaintiff's] pain should not be as severe as he makes it." (R. 364-67, 372-75.) Dr. Pilapil noted a history of rheumatoid arthritis, ankylosing spondylitis and osteoporosis, with associated pain; and an inability to sleep for more than two to three hours, with early morning stiffness. He stated that Plaintiff experienced pain relief when taking Enbrel, but opined that he "may need further treatment for better pain control." During the exam, Plaintiff exhibited some reduced range of motion in his spine, hip and neck, but his motor strength was 4+/5. (R. 369, 377.)

6

## 2. 2007 through 2008

Plaintiff returned to Dr. Dachman on February 26, 2007 due to a flare of spondylitis. (R. 425-27.) Plaintiff was "extremely noncompliant" with his methotrexate at that time, "perhaps due to finances," and he had significant hand and back pain of at least 5-6/10. He had been off Enbrel for a year due to lack of insurance, and he was getting poor results from a newly started course of Enbrel plus Fosamax and Vicodin. (R. 425.) Dr. Dachman prescribed double Enbrel for four weeks; a Medrol-Dosepak ending with prednisone; continued use of Vicodin and Fosamax; therapy, myofascial release and electrical stimulation; and subcutaneous injections. (R. 427-28.) X-rays taken the same day showed bridging osteophytes at multiple levels in the lower thoracic spine, probably indicating early ankylosing spondylitis; and abnormal sacroiliac joints indicating bilateral symmetric sacroiliitis. (R. 403-04.) X-rays of Plaintiff's hands, wrists, feet and ankles, however, were all unremarkable. (R. 405-12.)

One month later on March 26, 2007, Plaintiff saw Dr. Dachman for another flare of low back pain related to spondylitis. (R. 421-23.) Plaintiff was "not doing well" at that time, exhibiting "substantial lower back pain, limitation of spinal flexion, [and] limitation laterally with a definitely positive Schober's" (*i.e.*, difficulty flexing the back). (R. 421.) Dr. Dachman gave Plaintiff additional injections plus a Medrol-Dosepak, prescribed continued therapy,and contemplated switching him to Humira. (R. 423-24.) When Plaintiff returned to Dr. Dachman on May 14, 2007, he was "actually not doing too bad, although he [wa]s very deconditioned secondary to fatigue." (R. 419.) Plaintiff exhibited good range of motion, but he "look[ed] fatigued and deconditioned with slight weakness proximally." Dr. Dachman diagnosed spondylitis "under fair control complicated by deconditioning." (R. 420.)

On May 24, 2007, Terry Travis, M.D., affirmed Dr. Gilliland's PRTF finding that Plaintiff does not have any determinable psychiatric impairment or mental problem. (R. 436-41.) On June 18,

2007, Dr. Travis similarly affirmed the December 2006 RFCs performed by Dr. Pilapil. (R. 433-35.) Dr. Travis explained that despite the diagnosis of ankylosing spondylitis, "none of the x-rays or MRI's done show this condition." In Dr. Travis's view, Plaintiff's musculoskeletal system is "fine" and he is able to move his legs, arms and trunk without problems. (R. 435.)

Plaintiff saw Dr. Dachman again on June 25, 2007, but there is nothing new reported in the records. (R. 450.) Plaintiff missed an appointment in July, but returned to Dr. Dachman on October 15, 2007, at which time he was "doing awful" with another flare of spondylitis. (R. 444-46, 448.) Plaintiff told Dr. Dachman that he was experiencing pain at a level of at least 7-10/10 in his lower back and across his neck and shoulders. (R. 444.) He reported working part-time in retail, and driving seven hours from Minnesota to see the doctor. (R. 444-45.) Dr. Dachman stated that Plaintiff was "breaking through" the Enbrel and switched him to Humira. He also administered subcutaneous injections. (R. 446-47.)

On January 26, 2008, Dr. Dachman found Plaintiff to be "doing well" except that "his pain begins [to] reoccur just before his next Humira is due." Dr. Dachman boosted the injection period for the drug from every 15 days to every 10 days, and administered additional injections to help with the significant pain in Plaintiff's neck and shoulders. (R. 470-73.) An ultrasound of Plaintiff's right wrist taken the same day showed probable median nerve entrapment, and mild extensor digiti tenosynovitis with possible increased Doppler flow indicative of active inflammatory disease. (R. 477, 481.) Three days later, on January 29, 2008, Dr. Dachman prescribed Plaintiff Ambien "for sleep dysfunction." (R. 468, 491.)

By May 27, 2008, Plaintiff was running out of insurance and presented to Dr. Dachman "as an emergency with significant neck and shoulder pain" of at least 5-7/10, "worse with movement, better with rest." (R. 487.) Dr. Dachman administered bilateral occipital nerve blocks "at no charge," plus "trigger points and shoulder injections thereof." (R. 489-90.) A few months later on September 19, 2008, Dr. Dachman observed that Plaintiff had "focal complaint of right shoulder

8

fullness and impingement and a positive Schober's test with marked paravertebral and SI joint discomfort." Dr. Dachman warned Plaintiff that he needed to find a new rheumatologist "unless his account issues are rectified." (R. 484.)

## B.     Plaintiff's Testimony

Plaintiff testified that he worked a part-time retail job at Wilson's Leather for approximately nine or ten months between 2007 and 2008. (R. 46-48.) Throughout that time, he generally worked two days in a row at most, and then needed a couple days off to recuperate. (R. 48.) Plaintiff followed his wife to Minnesota when she found a job there, but he returns to Dr. Dachman in Illinois for medical treatment because the doctor is "really highly accredited," and given the long-term nature of Plaintiff's care, he "didn't want to start over with somebody else." (R. 50-52.)

In describing his symptoms, Plaintiff explained that he has good days and bad days. (R. 53.) He confirmed that he used to give himself Enbrel injections and take methotrexate, but that he recently switched to Humira injections alone. (R. 54-55.) Plaintiff is supposed to take injections every 10 days, but he waits 15 days due to concerns that he will run out of medication without additional insurance coverage. When taking Humira, Plaintiff experiences pain in the days before his next injection, then gets sick for a couple of days after a new injection because the drug "depletes your immune system." By the third, fourth and fifth days, Plaintiff starts feeling good, but by days seven, eight, nine and ten, the stiffness, aches and severe pains return, and he lays in bed all day tossing and turning until he gets another injection. (R. 56-58.) Plaintiff's doctor consistently increases and decreases the Humira dosage to ensure he is receiving the optimal amount of medication. In addition to the Humira, Plaintiff also takes prednisone, Fosamax and Norco. (R. 60.)

Plaintiff testified that he is unable to sleep for more than two hours at a time, and he feels a loss of energy from taking all of his medications. The result is "fatigue all the time." He received

physical therapy through Dr. Dachman's office, and they gave him some special stretching exercises, but he cannot afford therapy any longer. (R. 59.) Plaintiff said that he could probably work in a sedentary job for two days a week, but not five given his lack of energy and recurrent pain. (R. 60-61.) Around the house, Plaintiff makes the bed, wipes off the table, and thinks he could probably vacuum, but he cannot do a lot of bending due to his limited range of motion. He bathes himself, though it takes him longer to do so, and he reads, uses the computer and tries to do research. (R. 61-62.) Plaintiff testified that he spends a lot of time trying to find a comfortable position and get some sleep. He reiterated that he feels exhausted all the time, and stated that at least once a week, he has a bad day where he stays in bed all day. (R. 62.)

**C.    Medical Expert Testimony**

Donald I. Charous, M.D., is board certified in internal and geriatric medicine, and he testified at the hearing as a medical expert ("ME"). The ME first stated that Plaintiff has "rather severe ankylosing spondylitis and bilateral sacroiliitis," as well as osteoporosis, but that these conditions do not meet Listing 14.09(C) of the Social Security Regulations. (R. 29, 31-32.) He opined that Plaintiff would be limited to sedentary work with only occasional bending and stooping; no climbing of ropes, ladders or scaffolds; no exposure to extreme heat and cold; and the freedom to change position every 30 minutes. (R. 33.) In response to questions from Plaintiff's attorney, the ME agreed that Plaintiff's flare-ups would be episodic in nature, and noted that Plaintiff's medications can make him susceptible to infections. (R. 35-36.) The ME further opined that Plaintiff has "quite a bit of . . . pathology" such that he was debating whether Plaintiff might actually meet Listing 14.09. The ME said that he "can't rule that out, I think he has rather severe problems," stressing that Plaintiff takes strong medications, including steroids. (R. 36-37.) In addition, the ME acknowledged the possibility that "since [Plaintiff] gets these flare-ups . . ., he might miss a fair amount of work during the year," maybe two or more days per month. (R. 37.)

On reexamination by the ALJ, the ME testified that Plaintiff receives a lot of steroid injections into his soft tissues which, along with the underlying impairments, could cause fatigue. (R. 39.) He again characterized Plaintiff's condition as one of "remissions and exacerbations," but he clarified that Plaintiff may not miss two days of work every single month. Rather, Plaintiff might miss an entire week due to a flare-up, then be fine for two months, and then be out for another week due to a flare-up. The ME also stated that when Plaintiff has to miss work, it likely will be for more than two days at a time. (R. 40.) With respect to Plaintiff's specific flare-ups in February and October 2007, however, the ME did not know how long Plaintiff would have needed to be off of work. (R. 41-43.)

After listening to Plainff's testimony, the ME mentioned Dr. Dachman's May 2007 assessment that Plaintiff was very deconditioned secondary to fatigue, with a lot of morning stiffness. The ME noted that Plaintiff does have soft tissue myalgias requiring injections, and opined that such evidence "would tend to point to the fact that maybe he would not be able to do even sedentary work for a long period of time." (R. 63.)

David L. Biscardi, Ph.D., also testified at the hearing as a medical expert, stating that Plaintiff does not have a severe mental impairment. (R. 45-46.) Neither party disputes this finding for purposes of summary judgment.

## D.    Vocational Expert Testimony

Cheryl R. Hoiseth testified at the hearing as a vocational expert ("VE"). She noted that Plaintiff has a history of only part-time employment, with no specific vocational training. (R. 66-67.) The ALJ asked the VE to consider a hypothetical person with Plaintiff's vocational profile, who is limited to performing simple, repetitive tasks and has additional restrictions "described by Dr. Charous here today." (R. 68.) The VE testified that such an individual could perform several unskilled, sedentary jobs, including order clerk (1,000 jobs); information clerk (3,000 jobs); and

office clerk (1,000 jobs).  (*Id*.)  All of the jobs would accommodate a person who needs to "stretch for a little" throughout the day, but none would allow a person to miss more than a day and a half of work per month, or 18 days total in any work year.  (R. 69.)

## E.    The ALJ's Decision

The ALJ found that Plaintiff's ankylosing spondylitis with associated bilateral sacroiliitis is a severe impairment, but that it does not meet or equal one of the impairments listed in the Social Security Regulations.  (R. 19-20.)  In the ALJ's view, Plaintiff has the residual functional capacity ("RFC") to perform a full range of unskilled, sedentary work on a sustained basis.  (R. 20, 22.)  In reaching this conclusion, the ALJ accepted the ME's assessment that Plaintiff must be able to change position every 30 minutes; avoid temperature extremes, working around moving machinery, and climing ropes, ladders or scaffolds; and only occasionally climb stairs and ramps, balance, stoop, kneel, crouch or crawl.  (R. 20.)

The ALJ credited Plaintiff's testimony that his medications make him susceptible to acute illness, and that he has significant musculoskeletal system pain and fatigue on overexertion, such that he cannot be on his feet for four to six hours at a time for two days in a row.  The ALJ also agreed that Plaintiff experiences regular and continuous discomfort affecting his concentration and limiting him to unskilled work.  At the same time, the ALJ did not believe Plaintiff's statements regarding his illness and pain cycle while taking Humira, or his complaints of sleep disturbance and severe fatigue.  The ALJ noted, for example, that Plaintiff admits to lying in bed for an entire day as often as once a week despite claiming to be unable to perform sedentary work.  The ALJ also cited the ME's testimony that Plaintiff's fatigue might be caused by deconditioning, which is "not a medically determinable impairment."  (R. 21.)

In discussing Plaintiff's medical history, the ALJ found it significant that in October 2005, Plaintiff reported feeling better than ever, which he attributed to taking his medications, keeping

doctor appointments, watching his diet, and working out. The ALJ acknowledged Plaintiff's flares of spondylitis in February and October 2007, but stated that his work activity in 2007 and 2008 "indicate[s] that [Plaintiff's] functional capacity has been greater than [he] has generally alleged." (R. 22.) In the ALJ's view, Plaintiff's medications have been effective in controlling his symptoms, and his devotion to Dr. Dachman is "indicative of the effectivness of his treatment program." (R. 21-22.)

Based on these findings, the ALJ determined that Plaintiff can work as an order clerk, information clerk, or office clerk, and that these jobs exist in significant number in several regions of the national economy. Given the limitation to unskilled, sedentary work, the ALJ was not convinced that Plaintiff would miss more than 1 ½ days of work each month. (R. 23.)

### DISCUSSION

**A.   Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the

ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## B.      Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[4] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.      Analysis

Plaintiff raises several arguments in support of his request for reversal and remand: (1) the ALJ's hypothetical question to the VE was impermissibly vague and failed to include all of Plaintiff's evidenced limitations; (2) the ALJ wrongfully ignored the bulk of the ME's testimony; (3) the ALJ failed to inquire on the record whether the VE's testimony was consistent with the Dictionary of

---

[4]      The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

Occupational Titles (DOT); (4) the ALJ's credibility determination was inadequate; and (5) the ALJ wrongfully disregarded Plaintiff's subjective complaints without adequately developing the record. The court addresses each argument in turn.

### 1.    The ALJ's Hypothetical Question

Plaintiff first argues that the ALJ's hypothetical question to the VE was impermissibly vague, and that it did not include all of Plaintiff's medically supported impairments, such that the VE could not accurately assess whether Plaintiff could perform any work in the national economy.  The ALJ's hypothetical question to the VE was whether a person with Plaintiff's vocational profile could perform any work in the national economy if he had "the following restrictions, those described by Dr. Charus [sic] here today.  In addition, being limited to the performance of simple repetitive tasks." (R. 67-68.)

A hypothetical question posed by an ALJ to a VE ordinarily must include all of a Plaintiff's limitations that are supported by medical evidence.  *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).  In order for the ALJ to rely on the VE's testimony, the record must demonstrate that the VE considered the full range of an applicant's limitations in making his or her assessment.  *See, e.g.*, *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Patty v. Barnhart*, 189 Fed. Appx. 517, 521 (7th Cir 2006).  If the VE's testimony is not fully informed, the ALJ's reliance upon it will cause the ALJ to produce a defective RFC, such that the ALJ's decision will not be supported by substantial evidence.

The ALJ's mere referral to the restrictions described by the ME in the hypothetical posed to the VE is problematic because the ME's testimony was equivocal and internally inconsistent. The ME initially stated that Plaintiff "has a rather severe ankylosing spondylitis and bilateral sacroiliitis." (R. 29.)  With regard to Plaintiff's RFC, the ME opined that "it would be no more than sedentary." (R. 33.)  Yet when asked whether there would be days when Plaintiff would not even

be able to handle the sedentary work RFC he had described, the ME said he thought it was possible, due to flare-ups of Plaintiff's conditions and the "rather severe degree" of immunosuppressants he was prescribed. The ME further stated that "maybe [Plaintiff] would not be able to do even sedentary work for a long period of time." (R. 63.) Thereby the ME essentially set forth a RFC of sedentary work for Plaintiff and then backed off from that proposition throughout the rest of his testimony. Because of the contradictions within the ME's testimony, it is unclear what restrictions he ultimately provided for the purpose of the ALJ's hypothetical to the VE.

Had the ALJ enumerated specific restrictions derived from the ME's testimony, the basis for the VE's testimony that the Plaintiff could perform jobs that exist in significant numbers in the national economy would be clear. By simply referring to the restrictions described by the ME in such general fashion, however, the ALJ elicited, and subsequently relied on, suspect testimony from the VE. Illustratively, the ME opined that Plaintiff's condition could cause him to miss as little as two days a month of work, but it was more likely that he would need to miss a week of work periodically. (R. 40.) The VE, on the other hand, testified that no greater than a day and a half of absence from work per month is tolerated by employers. (R. 69.) Thus, if the VE truly had based her conclusions on all of the restrictions described by the ME, she could not have found the Plaintiff able to perform work in the national economy. The ALJ's inadequate hypothetical produced a domino effect whereby the VE provided misinformed conclusions that, in turn, undermine the ALJ's RFC in this case.

Defendant counters that hypotheticals posed by ALJs need not include medical evidence of record, and that the hypothetical posed in this instance was clear. Defendant's arguments are insupportable; as discussed above, it is well-established that a hypothetical an ALJ poses to a VE ordinarily must include all limitations supported by medical evidence of record. *See, e.g., Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Hofslien v. Barnhart*, 172 Fed. Appx. 116, 120 (7th Cir.

2006); *Halsell v. Astrue*, 357 Fed. Appx. 717, 723 (7th Cir. 2009). Plaintiff properly cites *Patty v. Barnhart*, 189 Fed. Appx. 517 (7th Cir. 2006), for this proposition.

To combat Plaintiff's contention that a hypothetical is inadequate if it does not include a medically supported limitation, Defendant selectively quotes from *Patty*: "[t]he hypothetical, though, need not include all of a claimant's alleged impairments." *Patty*, 189 Fed. Appx. at 521. This language refers to the limited exception for when the record demonstrates that the VE independently learned of the Plaintiff's limitations and accounted for them. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Defendant does not argue that the VE was sufficiently apprised of Plaintiff's limitations to make informed conclusions despite an incomplete hypothetical, however. Instead, Defendant cites *Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002), for what Defendant feels is the "correct standard for a hypothetical question." Defendant's Response at 10. The court in *Donahue* stated that the argument that the ALJ erred by "not includ[ing] in the list of problems [plaintiff's] personality disorder . . . seems to us picayune. The ALJ specified that [plaintiff] had difficulty interacting with others." *Donahue*, 279 F.3d at 444. In other words, the court felt that the plaintiff was splitting hairs in arguing that the ALJ didn't list his personality disorder when the ALJ had included difficulty getting along with others in his hypothetical.

Donahue thus reaffirms, rather than rebuts, the principle that the ALJ must account for all of a clamant's medically supported limitations. It is difficult to comprehend why Defendant would posit that *Donahue* is instructive to the case before the court. Defendant argues that here, as in *Donahue*, the hypothetical question contained all of the plaintiff's limitations. Yet in *Donahue* the ALJ listed numerous specific restrictions in his hypothetical question to the VE, whereas in this case the ALJ did not reference a single specific restriction other than limitation to performance of simple repetitive tasks. Defendant also alleges that the ALJ's reference to the restrictions described by the ME included all of Plaintiff's limitations such that the ALJ's hypothetical was not vague. Even if, *arguendo*, it is proper for an ALJ merely to refer generally to the restrictions

17

described by an ME instead of specifically listing limitations, that practice could be permissible only where the ME's testimony would clearly delineate all of the claimant's medically supported limitations. If the ME's testimony is clear, it is conceivable that the ALJ could fulfill his duty to include all of the clamant's medically supported limitations in his hypothetical by incorporating the restrictions described by the ME by reference. The ME's testimony was far from clear here, however, such that the ALJ's reference to it resulted in a hypothetical that is impermissibly vague.

Defendant's arguments regarding the requirements of hypothetical questions accordingly fail. Substantial evidence does not support the ALJ's decision as the result of his insufficient hypothetical question; on remand the ALJ shall specify the restrictions the VE is to consider in forming conclusions about Plaintiff's work capacity.

### 2.    The ALJ's Discussion of the ME's Testimony

Plaintiff next argues that the ALJ wrongfully ignored the bulk of the ME's testimony, particularly neglecting the testimony that favored Plaintiff's position that he could not handle full time work on a sustained basis. It is well-established that an ALJ cannot selectively discuss only evidence that favors his ultimate conclusion; an ALJ must base his decision on all of the relevant and credible evidence. *See, e.g.*, *Jenkins v. Astrue*, 544 F. Supp. 2d 736, 741 (7th Cir. 2008); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). Here, the ALJ did selectively discuss the evidence that favors his conclusion.

One example of the ALJ's selective discussion of the evidence involves the ME's testimony regarding whether Plaintiff meets the criteria for a listed impairment. At step 3 in the disability determination process, the ALJ stated that "[t]he expert in internal medicine explained why the criteria of § 14.09C and 14.09B of the Listing of Impairments had not been met or equaled." (R. 20.) It is true that when the ALJ asked the ME whether Plaintiff meets the criteria of any listing, the ME responded "I don't think so" and described the criteria that he felt the Plaintiff did not meet. (R.

31-32.)  The ALJ neglected to discuss the ME's full response to the listing question, however, which was certainly nuanced.  The ME testified that he debated finding that Plaintiff met a listing, and that Plaintiff's impairments "could possibly equal" a listing, in light of his "rather severe problems."  (R. 36.)

One would not know of the ME's equivocal responses, however, from reading the ALJ's decision. The ALJ indicates in his decision that he places great weight on the ME's opinions, finding them "to be the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole."  (R. 20.)  Yet the ALJ almost exclusively discusses the ME's findings which support the ALJ's decision that Plaintiff is not disabled. The ALJ notes the ME's findings that the medical evidence did not corroborate the degree of dysfunction that the Plaintiff experienced following treatment, that Plaintiff's impairments improved with treatment, and that Plaintiff's deconditioning might account for Plaintiff's perception of easy fatigue on exertion. (R. 21.)  The ALJ neglects, on the other hand, to discuss the ME's findings that flare-ups of Plaintiff's conditions could cause him to "miss a fair amount of work during the year," that while Plaintiff had improved in some areas he had gotten worse in others, and that Plaintiff's testimony that he could only work for a couple of days in a row before getting too fatigued to continue was consistent with his diagnosis of "fairly severe ankylosing spondylitis." (R. 37, 39, 65.)  The ALJ's decision should be informed by a more balanced discussion of the evidence than that provided here.

Defendant does not rebut Plaintiff's allegation that the ALJ impermissibly discussed the evidence of record selectively.  Instead, defendant provides a general defense of the ALJ's RFC, contending that the ALJ adopted the ME's testimony and that the ALJ's RFC tracked the ME's opinion.  Defendant thereby appears not to realize that the ALJ's failure to consider all of the relevant evidence alone constitutes grounds for remand, as it precludes the court from evaluating whether substantial evidence exists to support the ALJ's finding. *Smith*, 231 F.3d at 438; *see also Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).  Because the ALJ selectively discussed the

ME's testimony here, focusing almost solely on those aspects that favor his decision, the court finds that substantial evidence does not support that decision. On remand, the ALJ should demonstrate that he considers the full breadth of the ME's testimony and any other credible evidence in his decision.

### 3. The ALJ's Duty to Inquire about Consistency with the DOT

Additionally, Plaintiff argues that the ALJ erred by neglecting to inquire on the record whether the VE's testimony was consistent with the DOT. Defendant concedes that the ALJ has an affirmative duty to ask the VE whether her testimony is consistent with the DOT. This duty is imposed by Social Security Ruling (SSR) 00-4p and it was affirmed by the Seventh Circuit in *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006). Defendant contends, however, that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT is harmless error because there is no apparent conflict between the jobs identified by the VE and the DOT here. The Seventh Circuit applies a harmless error analysis to the ALJ's duty to inquire about such conflicts under SSR 00-4p. *See, e.g.*, *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 275 (7th Cir. 2010). If there is no actual conflict between evidence the VE provides about a job's requirements and the applicable information in the DOT, not asking the VE about whether there is a conflict can constitute harmless error. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

It is true, as Defendant contends, that Plaintiff does not point to any conflict between the the VE's depiction of the jobs identified for Plaintiff and the DOT's specifications. Yet Plaintiff alleges that the vagueness of the ALJ's hypothetical to the VE made it critical for the ALJ to ascertain whether the VE's testimony was consistent with the DOT. In conducting its harmless error analysis, the Seventh Circuit has also looked to whether the DOT's descriptions of jobs discussed by a VE conflict with the hypothetical limitations given by an ALJ. *See Ketelboer v. Astrue*, 550 F.3d 620, 625-26 (7th Cir. 2008); *Williams-Overstreet*, 364 Fed. Appx. At 275. Under

this precedent, the court cannot say that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT is harmless. Because of the inadequacy of the ALJ's hypothetical question, it is impossible to discern whether the DOT's descriptions of the jobs discussed by the VE conflict with the limitations that were supposed to have been elucidated by the ALJ. Therefore, on remand, the ALJ shall question the VE regarding the consistency of her testimony with the DOT and with the limitations he enumerates in his hypothetical questioning.

### 4.  The ALJ's Credibility Determination

Plaintiff's fourth argument is that the ALJ's credibility determination is inadequate because the ALJ never assessed medical evidence that supports Plaintiff's contention that he cannot fulfill the demands of full time work on a sustained basis. An ALJ's credibility determination is afforded considerable deference and is only overturned when it is patently wrong. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). This is so because the ALJ, rather than the reviewing court, is in the best position to determine a claimant's credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). For an ALJ to substantiate that a claimant is not credible, the ALJ must build a logical bridge between the evidence and that conclusion. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Plaintiff argues that the present case is analogous to *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006), for purposes of the credibility determination. In *Ribaudo*, the ALJ made an adverse credibility finding which was rejected by the court, because it found that the ALJ did not adequately explain why claimant's complaints of severe pain were inconsistent with the medical evidence, that the ALJ neglected evidence which supported the claimant's contention that he was in significant pain, and that the ALJ relied on an unsound basis in finding the claimant not credible. *Ribaudo*, 458 F.3d at 584-85. Plaintiff contends that in this case, similarly, the ALJ failed to discuss

significant medical evidence that supports Plaintiff's claims, resulting in an improper credibility determination.

As discussed above, the ALJ selectively discussed the medical evidence in this case, neglecting evidence favorable to Plaintiff's claims. This finding detracts from the Defendant's contention that substantial evidence supports the ALJ's credibility determination. On the other hand, unlike in *Ribaudo*, in this case the ALJ did adequately explain why he found some of Plaintiff's contentions to be less than credible and he provided sound bases for his reasoning for purposes of the court's credibility determination review.

The ALJ credited Plaintiff's allegations that he is susceptible to acute illness because of his medications and that he experiences significant musculoskeletal system pain and fatigue on overexertion. (R. 21.) At the same time, the ALJ did not credit Plaintiff's allegation of physical illness lasting two to three days after taking his medication, nor did he credit Plaintiff's allegation of medically severe fatigue and sleep disturbance. (R. 21.) In making these adverse determinations, the ALJ reasoned that the ME "noted that there is no documented complaint of sleep disturbance, adverse effects of treatment, or treatment for sleep disturbance documented." (R. 21.) Lack of evidentiary support in the record is certainly a sound basis for rejecting a claim. Defendant adds that the ALJ's examination of Plaintiff's activities of daily living supports his credibility determination. The ALJ could validly find that Plaintiff's ability to, for example, work out for at least thirty minutes five days a week (R. 329.), renders some of his more limiting claims less credible. *See, e.g., Elder v. Astrue,* 529 F.3d 408, 414 (7th Cir. 2008).

On these facts, and considering the high burden for disturbing an ALJ's credibility determinations, substantial evidence supports the ALJ's credibility determinations here. Undoubtedly, a more thorough discussion of the medical evidence than that conducted by the ALJ would have buttressed the notion that his credibility determination was proper. Nevertheless, this case is already being remanded to remedy that inadequacy; despite it, the ALJ's credibility

determinations are not patently wrong. Thereby, Plaintiff's argument regarding the ALJ's credibility determination is unavailing.

### 5. The ALJ's Consideration of Plaintiff's Subjective Complaints

Plaintiff's final argument is that the ALJ disregarded Plaintiff's subjective complaints without adequately developing the record. For this contention Plaintiff cites the Seventh Circuit's statement that an "ALJ must not disregard subjective complaints of disabling pain merely because they are more severe than what the medical record supports. Instead, the ALJ must develop the record and seek information about the severity of the pain and its effects on the applicant." *Hill v. Astrue*, 295 Fed. Appx. 77, 81 (7th Cir. 2008) (internal citation omitted). Plaintiff alleges that the ALJ should have sought additional medical evidence regarding Plaintiff's subjective claims, and that if he had done so, he would have found that Plaintiff cannot perform even a sedentary job. Defendant counters that the record contains sufficient evidence for the ALJ to have adjudicated Plaintiff's claims.

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). An ALJ is afforded substantial leeway with regard to that duty, however; the Seventh Circuit "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather" in a disability benefits case. *Id.* "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand. Instead a claimant must set forth specific, relevant facts - such as medical evidence - that the ALJ did not consider." *Id.* (internal citation omitted).

Defendant has the better argument in this instance. Plaintiff does not set forth any specific facts that were not presented to the ALJ. In actuality, Plaintiff's challenge is not to the amount of evidence before the ALJ, but rather to the ALJ's interpretation of that evidence. The ALJ had

extensive medical documentation and the ME's testimony before him, and he simply found that the evidence weighed against finding Plaintiff disabled for the purpose of his benefits claim. All of the evidence recited by Plaintiff regarding his condition in this argument was presented to the ALJ. To the extent that the ALJ rejected Plaintiff's subjective complaints, his decision indicates that he did so based on his interpretation of conflicting evidence. Thus, the ALJ did not violate *Hill*'s proscription, and Plaintiff's claim that the ALJ rejected Plaintiff's subjective complaints without adequately developing the record fails.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. Defendant's Cross-Motion for Summary Judgment is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.


ENTER:

Nan R. Nolan
_____

Nan R. Nolan
United States Magistrate Judge

Dated: August 25, 2010